IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

SCOT ALAN REUTHER,                          Case No. 2:11-cv-01449-PK

       Plaintiff,                           FINDINGS AND
                                            RECOMMENDATION

    v.

DR. MARVIN D. FICKLE; DR. JENNIFER L.
BOWMAN; LT. DONNA KAY SHERBONDY;
DARCI J. JENNINGS (STONEMAN); NATALIE
HEBISON (WHITE); MS. TRUDY EVANS,
PMHNP; MS. CHRISTY HENNING; MS.
JANA A. RUSSELL; MARK NOOTH; MICHAEL
F. GOWER; DR. J.M. CORVENO, M.D.; JOSHUA
HURST M. ED, TRCI Mental Health Specialist;
OFFICER JOHN W. CARTER (Male); OFFICER
ROBERT WILCOX; OFFICER RICARDO LOPEZ;
OFFICER GREG RAINSER; DR. STEVEN
SHELTON, employed as medical director at Oregon
Dept. of Corr.; DR. CHRISTOPHER P. DIGULIO,
employed as a doctor at Deer Ridge Corr. Inst.;
DR. LELAND BEAMER, employed as a doctor at

Page 1 - FINDINGS AND RECOMMENDATION

Oregon Dept. of Corrections; DR. DANIEL
DEWSNUP, employed as a doctor at Oregon Dept.
of Corrections; DR. TIM KELLY, employed as a
doctor at Oregon Dept. of Corrections; DR.
VANHOUTEN, as a doctor at Oregon Dept. of
Corrections; MR. ROBB NUTT, employed as a
Pharmacist at Snake River Corr. Inst.; DR.
BENNETT NORTON, employed as a doctor at
Two Rivers Corr. Inst.; DR. GARTH GULICK,
employed as a doctor at Snake River Corr. Inst.;
NURSE GRUENWALD, employed as a nurse
practitioner at Two Rivers Corr. Inst.; DR. DIEHL,
employed as doctor at Oregon Dept. of Corrections;
NURSE H. MILLER, employed as Nurse
practitioner Oregon Dept. of Corrections; MICHAEL
F. GOWER, employed as operators director at
Oregon Dept. of Corrections; MS. D. FUZI
employed as health services manager at D.R.C.I.,

                  Defendants.

_____

PAPAK, Magistrate Judge:

    Plaintiff Scot Alan Reuther, an inmate appearing *pro se*, filed a second amended

complaint ("SAC") on May 31, 2013 (#128).  The SAC names twenty-nine defendants in their

individual and official capacities.[1]  Defendants are doctors, nurses, corrections officers, and

administrators for the Oregon Department of Corrections ("ODOC").  In his SAC, Reuther

alleges defendants are liable under 42 U.S.C. § 1983 for violating his rights under the Fourth,

Eighth, and Fourtheenth Amendments of the United States Constitution.  Specifically, under

Claim I, Reuther alleges defendants were deliberately indifferent to his serious medical needs

_____

    [1] On April 28, 2014, the court granted Reuther's motion to voluntarily dismiss defendant
Dr. Diehl.  (# 185).  Moreover, after a thorough review of the complaint, I find Reuther has failed
to allege any facts regarding defendant Officer Greg Rainser.  Accordingly, I recommend
granting defendants' motion for summary judgment to the extent it seeks summary judgment as
to any claims against Officer Rainser.

when they discontinued his psychotropic medication, in violation of the Eighth Amendment.[2]

Under Claim II, Reuther alleges defendants seized and censored his legal materials, in violation

of the Fourth and Fourteenth Amendments.[3]  Under Claim III, Reuther alleges defendants seized

his prescription glasses, in violation of the Fourth Amendment.[4]  Finally, under Claim IV,

Reuther alleges defendants were deliberately indifferent to his serious medical needs by failing to

provide treatment and medication for his degenerative joint disease and multi-level degenerative

disease, in violation of the Eighth Amendment.[5]

Before the court is defendants' motion for summary judgment (#159).[6]  I have considered

the motion, supporting declarations and exhibits, and all of the pleadings on file.  For the reasons

set forth below, defendants' motion should be granted.

---

[2] Claim I is alleged against Dr. Marvin D. Fickle, Dr. Jennifer L. Bowman, Lt. Donna Kay Sherbondy, Darci J. Jennings (Stoneman), Natalie Hebison (White), Ms. Trudy Evans PMHNP, Christy Henning, Ms. Jana A. Russell, Mark Nooth, Michael F. Gower, Dr. J.M. Corveno MD, and Joshua Hurst M. ED.  I note medical records establish the correct spelling of Dr. J.M. Corveno MD is Dr. J.M. Corvino MD.

[3] Claim II is alleged against Officer John W. Carter.

[4] Claim III is alleged against Officer Robert Wilcox and Officer Ricardo Lopez.

[5] Claim IV is alleged against Dr. Steven Shelton, Dr. Christopher P. DiGulio, Dr. Leland Beamer, Dr. Daniel Dewsnup, Dr. Tim Kelly, Dr. VanHouten, Mr. Robb Nutt, Dr. Bennett Norton, Dr. Garth Gulick, Nurse Gruenwald, Nurse H. Miller, Michael F. Gower, and Ms. D. Fuzi.  I note medical records establish the correct spelling of Dr. DiGulio is Dr. DiGiulio.

[6] As discussed below, defendants Dr. Marvin D. Fickle and Dr. Jennifer L. Bowman have not been served with process and therefore are not part of the present motion for summary judgment.  However, all other defendants named in Claim I have moved for summary judgment, which is asserted against Dr. Fickle and Dr. Bowman.  As such, I will consider the allegations against Dr. Fickle and Dr. Bowman within that analysis.

Page 3 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Reuther is an inmate who was admitted to the custody of the ODOC on October 13, 2009. Decl. of Daryl Ruthven, M.D. (#164) ¶ 3.  Reuther was incarcerated at Snake River Correctional Institution ("SRCI") in Ontario, Oregon from December 23, 2009 until September 28, 2011, and at Two Rivers Correctional Institution ("TRCI") in Umatilla, Oregon from September 28, 2011 until November 26, 2012.  *Id.* at ¶ 6, Att. 1.  Reuther has since been moved to Deer Ridge Correctional Institution in Madras, Oregon and is currently incarcerated at Columbia River Correctional Institution in Portland, Oregon.  SAC at 1–2; Notice of Change of Address (#179).

## I.    Mental Health Treatment

On December 7, 2009, Reuther received a mental health evaluation by Karen Hernandez, Ph.D. at the prisoner intake center at Coffee Creek Correctional Facility.  Ruthven Decl. ¶ 7, Att. 2 at 1–2; Decl. of Scot Alan Reuther Claim I ("Reuther Decl. Claim I") (#176) at 5, Exs. 70–71. It was determined that prior to his incarceration, Reuther was prescribed Wellbutrin, Seroquel, Flexoril, and Klonopin.  *Id.*  It was also determined that in 1997 Reuther was diagnosed with bipolar disorder at Oregon Health and Science University ("OHSU") and had been on medication consistently for the previous four years.  *Id.*  On December 8, 2009, Reuther was evaluated by Dr. Daniel W. Dick, who recommended Reuther continue Wellbutrin, start Trazodone and Risperdal, and taper off Seroquel.  Ruthven Decl. ¶ 7, Att. 2  at 3–4.

On January 7, 2010, Reuther was seen by defendant Dr. Jennifer L. Bowman, a consulting psychiatrist.[7]  Ruthven Decl. ¶ 9, Att. 2 at 6–7; Reuther Decl. Claim I at 5, Exs. 73–74.  Reuther

---

[7] Although Reuther states in his SAC this examination took place on January 6, 2010, the record establishes this examination by Dr. Bowman took place on January 7, 2010.  Ruthven Decl. ¶ 9, Att. 2 at 6–7; Reuther Decl. Claim I at 5, Exs. 73–74.

reported a history of bipolar disorder, borderline personality disorder, and amphetamine and benzodiazepine dependence. *Id.* Reuther also reported his medication changes were not going well and since being taken off Seroquel he had suffered high anxiety, had nightmares about past abuse, slept poorly, and felt more depressed. *Id.* Dr. Bowman assessed that his long-term amphetamine use concurrent with his manic behaviors complicated his previous diagnosis of bipolar disorder. *Id.* Dr. Bowman diagnosed Reuther with anxiety disorder NOS, methamphetamine and benzodiazepine dependence, and borderline personal disorder. *Id.* Dr. Bowman also reviewed with Reuther medication options other than Seroquel and benzodiazepine. *Id.* Reuther agreed to a trial of Remeron in place of Trazodone, an adjustment of Wellbutrin, and stopping Risperdal. *Id.*

On January 15, 2010, Reuther sent Dr. Bowman an inmate communication, often referred to in the prison system as a "kyte," complaining of high anxiety due to the change in medication. Reuther Decl. Claim I at 5, Ex. 75. As a result, Dr. Bowman increased his Remeron dosage. *Id.* On February 10, 2010, Reuther sent an inmate communication to Behavioral Health Services ("BHS") complaining about Dr. Bowman and asking to see a different prescriber. Reuther Decl. Claim I at 5, Ex. 76. BHS scheduled an appointment for Reuther with defendant Dr. Marvin D. Fickle, a consulting psychiatrist. *Id.* On February 16, 2010, Reuther saw Dr. Fickle. Ruthven Decl. ¶ 10, Att. 2 at 8; Reuther Decl. Claim I at 5, Ex. 78. Dr. Fickle's diagnosis was essentially the same as Dr. Bowman's, finding Reuther suffered from anxiety disorder NOS, amphetamine dependence in early remission in a controlled environment, and borderline personality disorder. *Id.* Dr. Fickle continued Wellbutrin and Remeron. *Id.* On March 16, 2010, Dr. Fickle continued Wellbutrin, discontinued Remeron, and started Klonopin. Ruthven Decl. ¶ 11, Att. 2 at 9;

Reuther Decl. Claim I at 6, Ex. 80.  On April 20, 2010, Dr. Fickle adjusted Reuther's Wellbutrin

and Klonopin due to complaints of persistent anxiety.  Ruthven Decl. ¶ 12, Att. 2 at 10; Reuther

Decl. Claim I at 6, Ex. 83.

On April 27, 2010, defendant Lt. Donna Sherbondy reported to medical staff that Reuther

was seen passing his Wellbutrin to another inmate.  Ruthven Decl. ¶ 13, Att. 3 at 2; Reuther

Decl. Claim I at 6, Ex. 84.  On May 2, 2010, Dr. Fickle discontinued Reuther's Wellbutrin.

Ruthven Decl. ¶ 14, Att. 3 at 3.  While in the Disciplinary Segregation Unit ("DSU") Reuther

sent numerous inmate communications denying he had passed medications and complaining

about his medications being stopped.  Reuther Decl. Claim I at 6, Exs. 85–90.  On May 19, 2010,

while in the DSU, Reuther met with defendant Trudy Evans, a nurse practitioner.  Ruthven Decl.

¶¶ 15, 17, Att. 2 at 12.  Reuther reported to Ms. Evans he was not doing well because his

Seroquel and Wellbutrin had been discontinued.  *Id.*  He also denied reports of misusing

Wellbutrin.  *Id.*  Reuther insisted on having medications for his biploar disorder, post traumatic

stress disorder, depression, and anxiety, but refused all medications unless they were Wellbutrin

and Seroquel.  *Id.*  Ms. Evans continued Klonopin and advised Reuther to send an inmate

communication if he desired medication changes.  *Id.*

On June 15, 2010, Reuther sent BHS an inmate communication labeled "URGENT" and

"EMERGENCY" and stated he was suicidal.  Reuther Decl. Claim I at 7, Ex. 102–03.  That same

day, Reuther met with defendant Natalie Hebison (White), a BHS Case Manager for a suicide

assessment.  Ruthven Decl. ¶ 18, Att. 2 at 11, 13–14.  On June 21, 2010, Sara Bruce, B.A.

conducted a suicide assessment and placed Reuther on suicide close observation.  Ruthven Decl.

¶ 19, Att. 2 at 15–16.  Her overall assessment was "[Reuther] appears to be using suicide as a

way to get his needs met but still at risk." *Id.* Ms. Bruce's progress notes dated June 22, 2010, indicate Reuther reported he was feeling better and he apologized for sending an inmate communication suggesting he was suicidal. Ruthven Decl. ¶ 20, Att. 2 at 18.

On June 22, 2010, Ms. Evans saw Reuther, who had threatened self harm if he did not get Wellbutrin and Seroquel. Ruthven Decl. ¶ 17, Att. 2 at 17. Ms. Evans spent some time discussing with Reuther why these medications were not appropriate. *Id.* Reuther contended he had a history of bipolar disorder but Ms. Evans noted he had not reported or demonstrated bipolar symptoms. *Id.* She also advised Reuther that his medications would be adjusted based on liver function and not past history. *Id.* Ms. Evans prescribed Trazodone and Zoloft. *Id.*; Ruthven Decl. Att. 3 at 4.

On July 20, 2010, Ms. Evans noted nursing staff informed her Reuther had been caught "cheeking" Wellbutrin and Klonopin.[8] Ruthven Decl. ¶ 21, Att. 2 at 19. "Cheeking" medication is where an inmate does not swallow the medication, but instead hides it in their mouth under their tongue or on the roof of their mouth, with intent to give or sell it to someone else. Decl. of Steven Shelton, M.D. (#163) ¶ 23. Reuther did not admit or deny these allegations. Ruthven Decl. ¶ 21, Att. 2 at 19. Ms. Evans stated in her progress note she requested documentation of this incident and if appropriate would discontinue his Wellbutrin and Klonopin. *Id.* On August 2, 2010 and November 2, 2010, Ms. Bruce and Ms. White referred Reuther to individual and group therapy sessions. Ruthven Decl. ¶ 23, Att. 2 at 21–23. Defendant Christy Henning, M.S.W., a BHS supervisor, signed these referrals. *Id.*

---

[8] The record is not clear as to when Reuther was placed back on Wellbutrin and when this incident occurred.

On October 21, 2010, after his release from DSU, Reuther was seen again by Dr. Bowman.  Ruthven Decl. ¶ 24, Att. 2 at 24–25; Reuther Decl. Claim I at 9, Ex. 135–36.  In her progress notes, Dr. Bowman noted there had been a question of Wellbutrin misuse, but this allegation was cleared as Reuther had been found to be passing notes, not Wellbutrin.  *Id.*  Dr. Bowman also noted that a few days prior, Reuther had sent a page-long inmate communication expressing his frustration that his current diagnosis was not for bipolar disorder and itemized a variety of symptoms that were very distressing to him.  *Id.*  Reuther asked Dr. Bowman to continue his current medications and review his prior treatment records in order to better evaluate his diagnosis and medications.  *Id.*  When Dr. Bowman asked Reuther why a diagnosis of bipolar was so important to him, he stated that it was because his current diagnoses did not qualify him for sufficient case management and BHS attention.  *Id.*

After this appointment, Dr. Bowman reviewed Reuther's medical records from prior to incarceration.  *Id.*  Dr. Bowman noted the records consisted mostly of brief treatments, including an assessment at Washington County Jail, drop in clinics, and an initial visit to a primary care physician, all of which simply noted Reuther reported a history of bipolar disorder.  *Id.*  Dr. Bowman found the only records that appeared to be from an extended treatment relationship was an OHSU family practice clinic in 1999.  *Id.*  A psychiatric consultation by David Pollack M.D. noted "probable bipolar disorder" but noted active marijuana use and "intense borderline personality disorder."  *Id.*  Dr. Bowman assessed: "[w]hile the inmate is fixated on a diagnosis of bipolar disorder, presumably for the MH3 level of care it provides within the DOC, the records that he provides are not convincing for such, and in fact provide very strong evidence for borderline personality disorder.  The symptoms he endorses today are consistent with this as well

Page 8 - FINDINGS AND RECOMMENDATION

as possible PTSD.  Prior records note a history of trauma, but not PTSD symptoms at that time."
*Id.*

On November 22, 2010, Reuther again saw Dr. Bowman.  Ruthven Decl. ¶ 25, Att. 2 at 26; Reuther Decl. Claim I at 9, Ex. 137.  Dr. Bowman reported Reuther remained focused on wanting his diagnosis changed to bipolar disorder and reported his medications were ineffective. *Id.*  Because the charges of Reuther cheeking Wellbutrin had been retracted, Dr. Bowman restarted Wellbutrin.  *Id.*  Dr. Bowman also increased Trazodone for sleep and discussed mood stabilizer options.  *Id.*  At a visit on December 30, 2010, Reuther reported feeling much better once the Wellbutrin was restarted and even before he had actually taken it, but more recently reported his medications were no longer working due to a conflict with peers on his unit and a conflict with his cousin.  Ruthven Decl. ¶ 26, Att. 2 at 30; Reuther Decl. Claim I at 9, Ex. 138. Dr. Bowman adjusted Klonopin, increased Wellbutrin, and continued Trazodone.  *Id.*

On March 8, 2011, Reuther met with defendant Darci J. Jennings (Stoneman), a BHS Case Manager.  Ruthven Decl. ¶ 28, Att. 2 at 34.  Reuther reported doing fine but complained of cell mate problems.  *Id.*  Reuther also told Ms. Stoneman she would not be named in this lawsuit. *Id.*  Ms. Stoneman reported no evidence of bipolar symptoms.  *Id.*  Ms. Stoneman saw Reuther again on April 8, 2011, May 9, 2011, and June 15, 2011, and discussed his medical and mental health status.  Ruthven Decl. ¶ 28, Att. 2 at 43–44; Reuther Decl. Claim I at 9, Ex. 148.

Reuther did not see Dr. Bowman again until July 14, 2011.  Ruthven Decl. Att. 2 at 45. Dr. Bowman noted Reuther had been in DSU since his last visit.  *Id.*  Reuther reported he got 120 days for a racketeering charge for writing about how to print blank checks.  *Id.*  There was also some question of sexual activity with his cell mate.  *Id.*  During his time in DSU, Reuther was

prescribed Lamictal and Elavil, while his Klonopin and Trazodone were decreased. *Id.* Reuther reported an increase in anxiety due to problems with housing and work, as well as harassment by gangs. *Id.* Dr. Bowman changed his Trazodone for Benadryl and tapered Elavil. *Id.*

On July 26, 2011, Reuther was observed cheeking medication. Ruthven Decl. ¶ 35, Att. 4 at 5–7; Reuther Decl. of Extortion (#175) at 2–3, Exs. 5–6. At a disciplinary hearing Reuther admitted to the violation and claimed the medication in his mouth was Wellbutrin. *Id.* On August 11, 2011, Reuther saw Dr. Bowman again and expressed frustration with prison staff and his cell mate. Ruthven Decl. Att. 2 at 46. Dr. Bowman cross tapered Wellbutrin to Effexor and increased Klonopin. *Id.* On August 30, 2011, Dr. Bowman made additional modifications to Reuther's medication. Ruthven Decl. Att. 2 at 47; Reuther Decl. Claim I at 9, Ex. 150. However, on September 6, 2011, Reuther was again observed cheeking medication. Ruthven Decl. ¶ 35, Att. 4 at 8–10; Reuther Decl. of Extortion at 3, Ex. 7. Reuther admitted to the violation, claiming he was engaging in the distribution of his prescribed medication under duress by another inmate. *Id.* On September 20, 2011, Reuther reported to Dr. Bowman he was being disciplined for cheeking Benadryl and stated he was being extorted by his cell mate and feared assault. Ruthven Decl. Att. 2 at 48. Dr. Bowman made no changes to his medication. *Id.*

On September 28, 2011, Reuther was moved to TRCI. Ruthven Decl. at ¶ 29, Att. 1 at 2. Beginning in October 2011, Reuther began to meet with defendant Joshua Hurst, a BHS Case Manager. Ruthven Decl. ¶ 29, Att. 2 at 50; Reuther Decl. Claim I at 9, Ex. 151. The record indicates Mr. Hurst met with Reuther once or twice per month through March 2012. Ruthven Decl. ¶ 29, Att. 2 at 49–50, 56–57, 59–60, 64–66; Reuther Decl. Claim I at 10–11, Ex. 158, 171. During these visits Reuther discussed with Mr. Hurst his medical needs and concerns, and

Page 10 - FINDINGS AND RECOMMENDATION

Reuther denied having any thoughts of self harm.  *Id.*  Mr. Hurst later referred Reuther to

individual and group therapy sessions.  Ruthven Decl. Att. 2 at 54–55.

On October 25, 2011, Reuther was seen by defendant Dr. J.M. Corvino.  Ruthven Decl. ¶

30, Att. 2 at 51–52; Reuther Decl. Claim I at 9, Ex. 152–53.  Dr. Corvino noted Reuther alleged a

"laundry list" of diagnoses, however Dr. Corvino found Reuther's current diagnosis of borderline

personality disorder and polysubstance abuse appeared accurate.  *Id.*  Dr. Corvino noted

"[Reuther] is clearly used to being in charge of his meds.  He was very unhappy when I said we

were not likely to continue him on Klonopin indefinitely."  *Id.*  On October 28, 2011, Dr.

Corvino noted correctional officers found multiple letters in Reuther's cell addressed to another

inmate describing the buying and selling of multiple medications including Effexor, Klonopin,

Benadryl, and Xanax, and that two months prior Reuther had been caught cheeking medication.

Ruthven Decl. ¶ 31, Att. 2 at 53; Reuther Decl. Claim I at 9, Ex. 154.  Dr. Corvino noted Reuther

was clearly not taking his medications as directed or to treat his mental health, he has a severe

personality disorder which is only a weak indicator of a need for medication, and the medications

prescribed for Reuther constitute a significant risk of harm to him and other inmates if they are

misused.  *Id.*  Dr. Corvino's plan was to taper and discontinue all medications.  *Id.*  When Dr.

Corvino saw Reuther again on December 9, 2011, he reported no complaints of anxiety,

depression, or suicidal ideation.  Ruthven Decl. ¶ 32, Att. 2 at 58; Reuther Decl. Claim I at 11,

Ex. 176.

On January 12, 2012, Reuther was seen by Dr. Corvino with Mr. Hurst present.  Ruthven

Decl. ¶ 34, Att. 2 at 62–64.  Reuther complained of extreme anxiety, depression, poor sleep,

decreased appetite, and decreased concentration.  *Id.*  Dr. Corvino confronted Reuther with the

Page 11 - FINDINGS AND RECOMMENDATION

repeated charges of him buying and selling drugs and the discovery of letters in his cell. *Id.* Dr. Corvino also told Reuther he could not prescribe anything that could be abused in the ODOC. *Id.* Dr. Corvino reported Reuther responded angrily and contemptuously, and demanded he be provided the medications he had been prescribed prior to incarceration, including Klonopin and Xanax. *Id.* On January 24, 2012, Dr. Corvino received an inmate communication from Reuther where he angrily accused Dr. Corvino of lying, and demanded medication for anxiety. Ruthven Decl. Att. 2 at 62; Reuther Decl. Claim I at 11, Ex. 180–81.

On April 14, 2012, Mr. Hurst placed Reuther on suicide close observation because he was having difficulty with his unit transfer. Ruthven Decl. Att. 2 at 67–69. Mr. Hurst met with Reuther throughout the remainder of April 2012, as well as in May, June, and August of 2012. Ruthven Decl. Att. 2 at 70–72. The record shows Mr. Hurst placed Reuther on and off suicide close observation and suicide watch during this time. Ruthven Decl. Att. 2 at 73–77.

## II.    Back Pain Treatment

On January 26, 2011, Reuther underwent a cervical spine MRI at Holy Rosary Medical Center. Shelton Decl. ¶ 7; Decl. of Scot Alan Reuther Claim IV ("Reuther Decl. Claim IV") (#178) at 3, Exs. 53–54. The MRI showed moderate degenerative disc disease at several cervical levels, with some foraminal narrowing on the right C4-5 and C5-6. *Id.* On February 1, 2011, Reuther saw defendant Dr. Garth Gulick, who recommended to the Therapeutic Level of Care Committee ("TLOC") that Reuther be prescribed Ultram for his pain. Shelton Decl. ¶ 8, Att. 2 at 43; Reuther Decl. Claim IV at 3, Ex. 55. On February 9, 2011, the TLOC approved the Ultram prescription. *Id.* Reuther saw Dr. Gulick again on February 22, 2011 to do a skin biopsy for a rash on Reuther's left calf. *Id.*

On August 24, 2011, Reuther was seen by Dr. T. Bristol for his back pain. Shelton Decl.

¶ 9, Att. 2 at 42; Reuther Decl. Claim IV at 4, Ex. 61. Dr. Bristol noted Reuther had already been

prescribed Elavil by Dr. Bowman for his mental health and it would help his lower back pain. *Id.*

Dr. Bristol noted a history of Hepatitis B with a liver biopsy in years prior. *Id.* Dr. Bristol

requested the TLOC approve a liver biopsy to check for progression and current staging, which

the TLOC approved on September 21, 2011. Shelton Decl. ¶ 9, Att. 2 at 41–42.

On September 28, 2011, Reuther was transferred from SRCI to TRCI. Shelton Decl. ¶ 9,

Att. 1 at 2. On September 30, 2011, Reuther went to Health Services and requested to see a

doctor. Shelton Decl. ¶ 9, Att. 2 at 39–40; Reuther Decl. Claim IV at 4, Ex. 62. The nurse

scheduled an appointment with a provider for evaluation of a hernia and a liver biopsy, which the

TLOC had previously approved. *Id.* On October 3, 2011, Reuther saw defendant Dr. Bennett

Norton. Shelton Decl. ¶ 10, Att. 2 at 39; Reuther Decl. Claim IV at 4, Ex. 62. Dr. Norton

ordered an x-ray of Reuther's lower spine as a result of complaints of lumbar pain. *Id.* The x-ray

was completed on October 4, 2011, and showed mild degenerative changes with moderate

narrowing of L4-L5 disc space. Shelton Decl. ¶ 11, Att. 2 at 47; Reuther Decl. Claim IV at 4,

Ex. 63. On November 2, 2011, defendant Nurse Gruenwald attempted to go over Reuther's x-ray

and lab results with him. Shelton Decl. ¶ 12, Att. 2 at 38; Reuther Decl. Claim IV at 4, Ex. 66.

Reuther told Nurse Gruenwald he didn't want to be seen by her and wanted to see a real doctor.

*Id.* Nurse Gruenwald gave Reuther his lab and x-ray results and he refused an exam. *Id.* Nurse

Gruenwald noted Reuther had no gait disturbance, didn't appear to be in any acute pain, and

climbed on the table with no problems. *Id.*

Page 13 - FINDINGS AND RECOMMENDATION

On December 5, 2011, Dr. Norton prescribed Mobic, a non-steroidal anti-inflammatory used to treat arthritic or inflammatory symptoms such as pain, swelling, and stiffness of the joints. Shelton Decl. ¶ 13, Att. 2 at 36; Reuther Decl. Claim IV at 4, Ex. 69. Dr. Norton also discontinued Amitriptyline because Reuther complained of trouble urinating, a common side effect of the drug. *Id.* On December 28, 2011, Reuther underwent a liver biopsy, which showed minimal chronic hepatitis, with minimal disease activity and minimal to no scarring, and no evidence of cirrhosis. Shelton Decl. ¶ 14, Att. 2 at 35.

After complaining of back pain at sick call on January 4, 2012, Dr. Norton saw Reuther on January 11, 2012, noted he had multilevel (cervical and lumbar) degenerative disc disorder, and wrote an order to renew Ultram. Shelton Decl. ¶¶ 15–16, Att. 2 at 32–33; Reuther Decl. Claim IV at 4, Ex. 70–71. Reuther again complained of back pain at sick call on February 8, 2012, and Dr. Norton saw Reuther again on February 15, 2012. Shelton Decl. ¶¶ 17–18, Att. 2 at 30–31; Reuther Decl. Claim IV at 4, Exs. 73–74. Dr. Norton wrote Reuther a three-month trial prescription of Neurontin. Shelton Decl. ¶ 18, Att. 2 at 30; Reuther Decl. Claim IV at 4, Ex. 74. However on March 7, 2012, Nurse Gruenwald discontinued Reuther's Ultram and Neurontin when Reuther was sent to DSU for distributing medication. Shelton Decl. ¶ 19, Att. 2 at 27. Tablets were confiscated and found to be consistent with tablets Reuther had previously received. *Id.* When Dr. Norton saw Reuther on April 10, 2012, he discussed the diversion of medication with Reuther, reluctantly gave Reuther the benefit of the doubt, and restarted Ultram. Shelton Decl. ¶ 20, Att. 2 at 24; Reuther Decl. Claim IV at 5, Ex. 80.

On April 14, 2012, Reuther was placed on suicide close observation, which lasted until April 25, 2012. Shelton Decl. ¶ 21, Att. 2 at 14–23; Reuther Decl. Claim IV at 6, Ex. 82. Dr.

Norton discontinued his Ultram prescription on April 17, 2012. Shelton Decl. ¶ 21. Dr. Norton

saw Reuther again on May 16, 2012, and prescribed Neurontin and Lodine for his back pain.

Shelton Decl. ¶ 21, Att. 2 at 13–14; Reuther Decl. Claim IV at 6, Ex. 82–83. Dr. Norton also

discussed with Reuther that there would be serious repercussions if he was found diverting his

medication again. *Id.* At a follow up appointment with Dr. Norton on June 25, 2012, Reuther

complained of tingling in his fingers, but Dr. Norton noted Reuther walked with a normal gait

and no grimacing. Shelton Decl. ¶ 22, Att. 2 at 12; Reuther Decl. Claim IV at 6, Ex. 84. Dr.

Norton noted Reuther stated: "I'm never going to divert my medication again." *Id.* However, on

June 27, 2012, Reuther was caught cheeking his Neurontin and was sent to DSU on June 28,

2012. Shelton Decl. ¶ 23, Att. 2 at 11; Ruthven Decl. ¶ 35, Att. 4 at 1–4. As a result, Dr. Norton

discontinued his Neurontin noting "apparently he no longer needs this medication." Shelton

Decl. ¶ 23, Att. 2 at 11.

### III.    Seizure and Censor of Legal Materials

On January 18, 2011, defendant Officer John W. Carter discovered Reuther's "post-

conviction" legal documents in the cell of another inmate at SRCI, in violation of ODOC rules.

Decl. of John Carter (#161) ¶¶ 3–6. Upon finding these documents, Officer Carter confiscated

the documents, along with matching legal documents in Reuther's cell, and wrote disciplinary

reports for both inmates.[9] *Id.* ¶ 7; SAC at 9. On January 19, 2011, the confiscated materials were

returned to Reuther, with the exception of documents Officer Carter attached to the disciplinary

---

[9] Reuther states in his SAC the search of his cell occurred on January 1, 2011. SAC at
9–10. However, because he also states the legal materials were seized for a period of 24 hours
and returned to him on January 19, 2011, it appears the correct date of the search is January 18,
2011.

report as evidence.  Carter Decl. ¶ 8; SAC at 10.  On January 20, 2011, Officer Carter concluded

an investigation which found the legal materials included plans and materials on how to forge

checks and commit credit card fraud.  Carter Decl. ¶ 9.  On January 25, 2011, Reuther was found

to have violated Rule 4.35 Racketeering and sentenced to DSU for 120 days and loss of

privileges.  *Id.* ¶ 10.

## IV.    Seizure of Prescription Glasses

On May 17, 2010, Reuther was admitted into DSU at SRCI.  SAC at 10; Decl. of James

Taylor (#162) ¶ 3–4, Att. 1 at 2.  Reuther alleges sometime between 4:00 and 4:30 A.M., during

a strip search at intake, two officers removed his prescription eyeglasses and told him they would

be put into his property according to ODOC policy.  SAC at 10; Decl. of Scot Alan Reuther

Claim III ("Reuther Decl. Claim III") (#177) at 1.  Reuther alleges these two officers were

defendants Officer Robert Wilcox and Officer Ricardo Lopez.  *Id.*

Reuther sent inmate communications to prison officials asking that his glasses be

returned.  Reuther Decl. Claim III at 1, Ex. 1–4.  However, officials responded that there were no

eyeglasses in his property.  *Id.*  On May 25, 2010, Reuther filed a grievance stating the glasses

had never been returned to him.  Taylor Decl. ¶ 4, Att. 2 at 2; Reuther Decl. Claim III at 1–2, Ex.

5.  Grievance Coordinator Theresa Hicks received Reuther's grievance on May 27, 2010 and

assigned Lieutenant James Taylor to investigate the issue.  Taylor Decl. ¶ 4, Att. 2 at 3–4.  On

June 3, 2010, Lt. Taylor responded to Reuther's grievance stating there was no record of him not

receiving his eyeglasses upon admission to DSU.  Taylor Decl. ¶ 5, Att. 2 at 5–6; Reuther Decl.

Claim III at 2, Ex. 6.  Lt. Taylor explained except where an inmate is under a suicide watch or

when eyeglasses are evidence, eyeglasses are not maintained in Special Housing Unit ("SHU")

Page 16 - FINDINGS AND RECOMMENDATION

property, but given to the inmate as they are admitted. *Id.* When Reuther was admitted to DSU

on May 17, 2010, he was not on suicide watch or suicide close observation. *Id.*

On June 9, 2010, Reuther filed a First Appeal to his grievance response, which was

received by the Grievance Coordinator on June 11, 2010. Taylor Decl. ¶ 6, Att. 2 at 7–9; Reuther

Decl. Claim III at 2, Ex. 18. Meanwhile Reuther continued to send inmate communications

complaining about the missing eyeglasses. Taylor Decl. Att. 2 at 15–17; Reuther Decl. Claim III

at 2, Ex. 10. Prison officials continued to respond that they could not locate the eyeglasses and

would present his request for indigent eyeglasses to the Eyeglasses Review Committee according

to ODOC policy. Reuther Decl. Claim III at 2, Ex. 7–8, 10. On July 16, 2010, the

Superintendent's Office responded to Reuther's First Appeal stating there was no evidence

Reuther's eyeglasses were confiscated upon admission to the DSU. Taylor Decl. ¶ 6, Ex. 2 at 11;

Reuther Decl. Claim III at 2, Ex. 19. The response stated the staff performed a thorough search,

there was no paperwork indicating handling of his eyeglasses, nor did they find any eyeglasses in

Reuther's property. *Id.* Reuther continued to make additional complaints regarding his missing

eyeglasses, asking prison officials to check the DSU intake cameras. Taylor Dec. Att. 2 at

13–14; Reuther Decl. Claim III at 2, Ex. 12–17.

On July 28, 2010, Reuther sent a tort claim notice pursuant to Or. Rev. Stat. § 30.275 to

Ms. Hicks, Superintendent Mark Nooth, Officer Wilcox, and Officer Lopez. Reuther Decl.

Claim III at 2–3, Ex. 21–23. On August 3, 2010, Reuther filed his Second Appeal to his

grievance response. Taylor Decl. ¶ 7, Att. 2 at 18; Reuther Decl. Claim III at 3, Ex. 28. On

August 10, 2010, Ms. Hicks denied Reuther's Second Appeal on the grounds that he had filed a

tort claim notice, and therefore could not continue the grievance process. Taylor Decl. ¶ 7, Att. 2

Page 17 - FINDINGS AND RECOMMENDATION

at 1, 19; Reuther Decl. Claim III at 3, Ex. 29.  On August 24, 2010, the Inmate Claims Unit acknowledged receipt of Reuther's tort claim notice and informed him he needed to submit documentation to substantiate his allegations.  Reuther Decl. Claim III at 2–3, Ex. 24.  On October 7, 2010, the Inmate Claims Unit notified Reuther they found no merit to the allegations of his missing eyeglasses and denied his claim.  Reuther Decl. Claim III at 2–3, Ex. 25.  On November 4, 2010, Health Services informed Reuther they ordered new glasses for him.  Reuther Decl. Claim III at 3, Ex. 33.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show [] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990).

In civil cases involving a *pro se* plaintiff, the court construes the pleadings liberally and affords the plaintiff the benefit of any doubt. *Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir.

Page 18 - FINDINGS AND RECOMMENDATION

2008). *Pro se* complaints are held to a less strict standard than those drafted by a lawyer.
*Bonner v. Lewis*, 857 F.2d 559, 563 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519,
520 (1972); *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir.
1990) (courts can infer claims from pleadings).  Before dismissing a *pro se* complaint, the court
must, in many circumstances, instruct the *pro se* litigant as to the deficiencies in the complaint
and grant leave to amend.  *See Eldridge v. Block*, 832 F.2d 1132, 1136 (9th Cir. 1987).
Nevertheless, a *pro se* plaintiff's claims may be dismissed where it appears beyond doubt that
plaintiff can prove no set of facts in support that would entitle him to relief.  *Barrett v. Belleque*,
554 F.3d 1060, 1061 (9th Cir. 2008).  Nor is a *pro se* litigant excused from following court rules,
including basic pleading requirements.  *Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227
F.3d 1104, 1107 (9th Cir. 2000).

## ANALYSIS

Defendants argue: (1) Reuther's claims against defendants in their official capacity are
barred by the Eleventh Amendment; (2) defendants did not violate Reuther's Eighth Amendment
rights; (3) defendant supervisors cannot be held liable under a theory of *respondeat superior*; (4)
defendants did not violate Reuther's Fourth and Fourteenth Amendment rights; and (5)
alternatively, defendants are entitled to qualified immunity.  Defs.' Mot. Summ. J. at 2.

## I.    Eleventh Amendment Immunity

Defendants argue all claims against them in their official capacities are barred by the
Eleventh Amendment.  Defs.' Mem. Supp. Mot. Summ. J. at 6–7.  I agree.

The Eleventh Amendment bars actions for damages against state officials, who are sued
in their official capacity.  *Roman v. Bible*, 169 F.3d 1182, 1185 (9th Cir. 1999).  In contrast, the

Page 19 - FINDINGS AND RECOMMENDATION

Eleventh Amendment does not bar actions for damages against state officials who are sued in their individual capacity. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). In *Hafer*, the Supreme Court explained "the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Id.*

Reuther's SAC states all defendants are sued in their individual and official capacities. SAC at 11, 17.[10]  As such, all of Reuther's claims against defendants in their official capacities are barred by the Eleventh Amendment. However, Reuther's claims against defendants in their individual capacities are not barred by the Eleventh Amendment. Accordingly, defendants should be entitled to summary judgment in their favor on all claims asserted against them in their official capacities, but not in their individual capacities.

## II.    Deliberate Indifference to Serious Medical Need

The Supreme Court has established that a public official's "deliberate indifference to a prisoner's serious illness or injury" violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To prevail on an Eighth Amendment deliberate indifference claim, a prisoner must establish both (i) he suffered an objectively serious illness or injury while incarcerated and (ii) prison officials were subjectively aware of the seriousness of the condition and deliberately denied or delayed access to medical care that could reasonably have been provided. *See Clement v. Gomez*, 298 F.3d 898, 904–05 (9th Cir. 2002). The objective component is satisfied "whenever the failure to treat a prisoner's

---

[10]  Pagination for Claim IV of the SAC is listed separately as pages 1 through 6. To avoid confusion I will use the pagination assigned by the CM/ECF system.

condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 904 (internal citations and quotation marks omitted).

Under applicable Ninth Circuit case law, "[a] determination of 'deliberate indifference' involves an examination of two elements: [1] the seriousness of the prisoner's medical need and [2] the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). A finding of "deliberate indifference" necessarily requires "inquiry into a prison official's state of mind." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). Specifically, the Supreme Court has defined "deliberate indifference" in the Eighth Amendment context to mean that "a prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Moreover, under applicable Ninth Circuit jurisprudence, "there are certain [additional] minimum requirements before deliberate indifference can be established." *McGuckin*, 974 F.2d at 1060.

> First, there must be a purposeful act or failure to act on the part of the defendant. "An *accident*, although it may produce added anguish, is not on that basis *alone* to be characterized as wanton infliction of unnecessary pain" sufficient to demonstrate deliberate indifference, [*Estelle*], 429 U.S. at 105 . . . (emphases added), nor does "an *inadvertent* failure to provide adequate medical care" by itself . . . create a cause of action under § 1983. *Id.* A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.

> Second, when . . . a claim alleges "mere delay of surgery," a
> prisoner can make "no claim for deliberate medical indifference
> unless the denial was harmful." *Shapley v. Nevada Board of State
> Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam).
> However, a finding that the defendant's activities resulted in
> "substantial" harm to the prisoner is not necessary, *see* [*Wood v.
> Housewright*, 900 F.2d 1332, 1339–40 (9th Cir. 1990)]; *see also*
> [*Hudson v. McMillian*, 503 U.S. 1, 8–10 (1992)] (rejecting
> "significant injury" requirement and noting that the Constitution is
> violated "whether or not significant injury is evident"), although a
> finding that the inmate was seriously harmed by the defendant's
> action or inaction tends to provide additional *support* to a claim
> that the defendant was "deliberately indifferent" to the prisoner's
> medical needs: the fact that an individual sat idly by as another
> human being was seriously injured despite the defendant's ability
> to prevent the injury is a strong indicium of callousness and
> deliberate indifference to the prisoner's suffering. *See* [*Estelle*],
> 429 U.S. at 106 . . . (holding that a defendant's action or inaction
> could be "sufficiently harmful to evidence deliberate indifference
> to serious medical needs"); *Ortiz v. City of Imperial*, 884 F.2d
> 1312, 1313–14 (9th Cir. 1989) (reversing summary judgment in
> part because inaction of doctors and nurses resulted in inmate's
> death).

*Id.* (emphasis in original; footnote omitted).  Nevertheless, "[t]he requirement of deliberate

indifference is less stringent in cases involving a prisoner's medical needs than in other cases

involving harm to incarcerated individuals because '[t]he State's responsibility to provide

inmates with medical care ordinarily does not conflict with competing administrative concerns.'"

*Id.* (quoting *Hudson*, 503 U.S. at 6) (alteration in original).

Applicable Ninth Circuit jurisprudence further establishes that a difference of medical

opinion between an incarcerated prisoner and his or her health care provider regarding the

efficacy or advisability of the medical treatment provided to the prisoner is "insufficient, as a

matter of law, to establish deliberate indifference." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th

Cir. 2004) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).  "Rather, to prevail

on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'" *Id.* (quoting *Jackson*, 90 F.3d at 332) (internal modifications omitted).

## A.    Mental Health Treatment

Defendants argue they were not deliberately indifferent to Reuther's mental health needs. Defs.' Mem. Supp. Mot. Summ. J. at 7–12. I agree. Significantly, Reuther has failed to include any allegations concerning the state of mind of defendants. *See Clement*, 298 F.3d at 904–05 (providing that a prison official must be subjectively aware of the seriousness of the condition and deliberately deny or delay access to medical care that could reasonably have been provided). Nor does the record support an inference that defendants acted in conscious disregard to Reuther's mental health needs.

### 1.    Dr. Bowman

Reuther alleges Dr. Bowman was deliberately indifferent to his mental health needs when she changed his diagnosis on January 7, 2010, resulting in less treatment and medication. SAC at 4–5.

Reuther's allegation is insufficient to survive summary judgment. During this examination on January 7, 2010, Reuther reported a history of bipolar disorder, borderline personality disorder, and amphetamine and benzodiazepine dependence, prior to incarceration. Ruthven Decl. ¶ 9, Att. 2 at 6–7; Reuther Decl. Claim I at 5, Exs. 73–74. However, Dr. Bowman assessed his long-term amphetamine use concurrent with his manic behaviors complicated his previous diagnosis of bipolar disorder. *Id.* Dr. Bowman diagnosed Reuther as having anxiety

Page 23 - FINDINGS AND RECOMMENDATION

disorder NOS, methamphetamine and benzodiazepine dependence, and borderline personal disorder, but not bipolar disorder. *Id.*

When Reuther saw Dr. Bowman again on October 21, 2010, she noted the day prior Reuther had sent a page-long inmate communication expressing frustration that his current diagnosis was not for bipolar disorder. Ruthven Decl. ¶ 24, Att. 2 at 24–25; Reuther Decl. Claim I at 9, Exs. 135–36. When Dr. Bowman asked Reuther why a diagnosis of bipolar was so important to him, he stated that it was because his current diagnoses did not qualify him for sufficient case management and BHS attention. *Id.* After this appointment, Dr. Bowman reviewed Reuther's medical records from prior to incarceration and found "[w]hile the inmate is fixated on a diagnosis of bipolar disorder, presumably for the MH3 level of care it provides within the [O]DOC, the records that he provides are not convincing for such, and in fact provide very strong evidence for borderline personality disorder." *Id.*

Although it is clear Reuther disagrees with Dr. Bowman's diagnosis, Reuther presents no evidence that Dr. Bowman's diagnosis was "medically unacceptable." *See Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference); *cf. Snow v. McDaniel*, 681 F.3d 978, 986–87 (9th Cir. 2012) (finding that there was a genuine issue of material fact as to whether the defendants were deliberately indifference to plaintiff's medical needs where outside specialists and the plaintiff's treating physicians all recommended the same corrective surgery). Dr. Fickle's diagnosis of Reuther was essentially the same as Dr. Bowman's. Ruthven Decl. ¶ 10, Att. 2 at 8; Reuther Decl. Claim I at 5, Ex. 78. Ms. Evans and Ms. Jennings (Stoneman) both noted Reuther had not demonstrated any bipolar symptoms. Ruthven Decl. ¶¶

17, 28, Att. 2 at 17, 34. Finally, when Reuther was moved to TRCI, Dr. Corvino noted Reuther alleged a "laundry list" of diagnoses, however he found Reuther's current diagnosis of borderline personality disorder and polysubstance abuse appeared accurate. Ruthven Decl. ¶ 30, Att. 2 at 51–52; Reuther Decl. Claim I at 9, Ex. 152–53.

While Reuther argues his records from prior to incarceration establish bipolar disorder, Dr. Bowman reviewed those records and found they established borderline personality disorder, but not bipolar disorder. Ruthven Decl. ¶ 24, Att. 2 at 24–25; Reuther Decl. Claim I at 9, Ex. 135–36. Even if Dr. Bowman was incorrect in her diagnosis of Reuther, such a mistake would not amount to an Eighth Amendment violation. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012) (explaining that because the defendant did not believe plaintiff was suffering from a hernia, the defendant's decision to not operate was a mere "negligent misdiagnosis" rather than deliberate indifference). Accordingly, Dr. Bowman is entitled to summary judgment.

### 2.    Lt. Sherbondy

Reuther alleges Lt. Sherbondy falsely reported to medical staff on April 27, 2010, that he had been passing Wellbutrin to another inmate, with the malicious intent of having his medication discontinued. SAC at 5.

Reuther's allegation is insufficient to survive summary judgment. A progress notes entry dated April 27, 2010, indicates Lt. Sherbondy contacted medical staff and reported Reuther had been seen passing his Wellbutrin to another inmate.[11] Ruthven Decl. ¶ 13, Att. 3 at 2; Reuther Decl. Claim I at 6, Ex. 84. As a result, on May 2, 2010, Dr. Fickle discontinued Reuther's

---

[11] I am unable to determine who made this progress notes entry as the signature is illegible and defendants have not identified this person.

Page 25 - FINDINGS AND RECOMMENDATION

Wellbutrin (bupropion). Ruthven Decl. ¶ 14, Att. 3 at 3. While in DSU for this allegation, Reuther met with Ms. Evans on May 19, 2010 to discuss his medications and mental health symptoms. Ruthven Decl. ¶¶ 15, 17, Att. 2 at 12. Reuther refused all medications unless they were Wellbutrin and Seroquel. *Id.* Although Ms. Evans would not prescribe these, she continued Klonopin. *Id.* When Ms. Evans saw Reuther again on June 22, 2010, Reuther had threatened self harm if he did not get Wellbutrin and Seroquel. Ruthven Decl. ¶ 17, Att. 2 at 17. Ms. Evans spent some time discussing with Reuther why these medications were not appropriate and prescribed Trazodone and Zoloft. *Id.*; Ruthven Decl. Att. 3 at 4. When Reuther was later cleared of this allegation, Dr. Bowman restarted Wellbutrin. Ruthven Decl. ¶ 24, Att. 2 at 24–25; Reuther Decl. Claim I at 9, Ex. 135–36.

      Reuther has failed to present any evidence that Lt. Sherbondy made this report to medical staff with the malicious intent of having his medication discontinued. *See Clement*, 298 F.3d at 904–05 (providing that a prison official must be subjectively aware of the seriousness of the condition and deliberately deny or delay access to medical care that could reasonably have been provided). Reuther merely states in his SAC "I believe her intent was malicious by knowing what would happen." SAC at 5. Further, contrary to Reuther's assertions, the record shows during his time in DSU, his medication was not discontinued. Although Dr. Fickle discontinued Reuther's Wellbutrin because of allegations of misuse, it is undisputed that while in DSU he received Klonopin and was seen regularly by Ms. Evans who prescribed Trazodone and Zoloft. Ruthven Decl. Att. 2 at 12, 17; Ruthven Decl. Att. 3 at 4. Accordingly, Lt. Sherbondy is entitled to summary judgment.

### 3.    Dr. Fickle

Reuther alleges Dr. Fickle was deliberately indifferent to his serious medical needs when on May 2, 2010, he discontinued all psychotropic medication without examination, and failed to respond to his inmate communications while in DSU.  SAC at 4.

Reuther's allegations are insufficient to survive summary judgment.  As noted above, on May 2, 2010, Dr. Fickle discontinued Reuther's Wellbutrin (bupropion) after allegations of misuse.  Ruthven Decl. ¶¶ 13–14, Att. 3 at 3.  However, contrary to Ruther's assertions, Dr. Fickle did not discontinue all psychotropic medication.  The record shows Reuther continued to receive Klonopin and Ms. Evans prescribed him Trazodone and Zoloft.  Ruthven Decl. Att. 2 at 12, 17; Ruthven Decl. Att. 3 at 4.  Although it is clear Reuther disagreed with Dr. Fickle's decision to discontinue Wellbutrin, Reuther presents no evidence that such decision was "medically unacceptable." *Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference).

In regards to the inmate communications, the record shows Reuther sent three inmate communications to Dr. Fickle while in DSU.  On May 4, 2010, Reuther asked Dr. Fickle why his medication was stopped and complained of depression and anxiety.  Reuther Decl. Claim I at 6, Ex. 85.  Dr. Bowman responded "Dr. Fickle is out of the office until next week.  I see that Dr. Fickle stopped the Wellbutrin after he received a report that you were observed passing the Wellbutrin to someone else.  I will forward this to Dr. Fickle when he returns." *Id.*  On May 7, 2010, Reuther sent another inmate communication to Dr. Fickle where he denied any misuse of Wellbutrin and stated "Need My Medication."  Reuther Decl. Claim I at 6, Ex. 87.  Dr. Fickle

responded "[u]ntil I receive notice to the contrary, I must presume that the officer's report is accurate. Given your multiple demands regarding timing of dose, then a discovery that you are passing the medication, we can only assume it is accurate." *Id.* On May 22, 2010, Reuther sent another inmate communication to Dr. Fickle where he accused him of "deliberate indifference," denied any misuse of Wellbutrin, and asked for Seroquel and Wellbutrin. Reuther Decl. Claim I at 6, Ex. 92. Dr. Fickle responded "[w]hile you are in DSU, you will be seen by Ms. Evans. She will evaluate your current situation." *Id.*

 Upon review of the inmate communications and responses, I find Reuther's allegations insufficient to demonstrate Dr. Fickle was deliberately indifferent. With the exception of the May 4, 2010 inmate communication when Dr. Fickle was out of the office and Dr. Bowman responded in his absence, Dr. Fickle responded to Reuther's complaints and referred him to the proper official in DSU for treatment. As such, a jury could not conclude that Dr. Fickle was deliberately indifferent. *See McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.") Accordingly, Dr. Fickle is entitled to summary judgment.

### 4. Ms. Evans

 Reuther alleges Ms. Evans was deliberately indifferent to his serious medical needs when she refused to treat his past diagnosis, even after numerous inmate communications requesting treatment of symptoms of mental instability. SAC at 6–7.

 Reuther's allegations are insufficient to survive summary judgment. While in DSU, Ms. Evans saw Reuther on May 19, 2010, June 22, 2010, and July 20, 2010. Ruthven Decl. ¶¶ 15, 17, 21, Att. 2 at 12, 17, 19. When Ms. Evans saw Reuther on June 22, 2010, Reuther was on

suicide watch for threatening harm to himself if he did not get Wellbutrin and Seroquel. Ruthven

Decl. ¶ 17, Att. 2 at 17. Ms. Evans spent time explaining to Reuther why those medications were

not appropriate and allowed him to ask questions. *Id.* Reuther contended he had a history of

bipolar disorder but Ms. Evans noted he had not reported or demonstrated bipolar symptoms. *Id.*

Ms. Evans also noted Reuther's primary presentation continued to be borderline personality traits

and he presented as anxious but had a lot of stressors in his life at the time. *Id.* Physician's

Orders signed by Ms. Evans show his medications were adjusted to Trazodone and Zoloft.

Ruthven Decl. ¶ 17, Att. 3 at 4.

Although it is clear Reuther disagrees with Ms. Evan's diagnosis, Reuther presents no

evidence that such decision was "medically unacceptable." *See Toguchi*, 391 F.3d at 1058

(difference of opinion between a physician and prisoner concerning the appropriate course of

treatment is insufficient, as a matter of law, to establish deliberate indifference). As noted above,

Dr. Bowman, Dr. Fickle, Ms. Jennings (Stoneman), and Dr. Corvino, all found Reuther does not

suffer from bipolar disorder. To the extent Reuther alleges Ms. Evans failed to respond to his

inmate communications, the record shows she promptly responded to all of his inmate

communications. *See* Reuther Decl. Claim I, Exs. 91, 94–95, 98, 105, 107, 112, 116–17, 119,

122, 123–24, 125. As such, a jury could not conclude that Dr. Fickle was deliberately

indifferent. *See McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to

respond to a prisoner's pain or possible medical need in order for deliberate indifference to be

established.") Accordingly, Ms. Evans is entitled to summary judgment.

### 5.    Ms. Hebison (White)

Reuther alleges Ms. Hebison (White) was deliberately indifferent to his serious medical needs by not getting him to a prescriber to help his conditions of confinement and by repeatedly ignoring his inmate communication forms and/or referring him to someone else.  SAC at 6.

Reuther's allegations are insufficient to survive summary judgment.  On June 15, 2010, Reuther sent BHS an inmate communication labeled "URGENT" and "EMERGENCY" and stated he was suicidal.  Reuther Decl. Claim I at 7, Ex. 102–03.  That same day, Ms. White met with Reuther to do a suicide assessment.  Ruthven Decl. ¶ 18, Att. 2 at 11, 13–14.  Reuther stated he was not suicidal or going to harm himself, but had increased anxiety, reduced sleep, and loss of appetite which he attributed to the stress of BHS management not changing his medications, feeling that a doctor was unjust, and personal issues with his cell mate.  *Id.*  Ms. White met with Reuther three times in November and December of 2010 and discussed his needs.  Ruthven Decl. ¶ 18, Att. 2 at 27–29.

Although Reuther alleges Ms. White failed to respond to his inmate communications, the record shows Ms. White or another BHS case worker promptly responded to all inmate communications addressed to her.  *See* Reuther Decl. Claim I at 7–8, Exs. 104, 106–07, 109–10, 114–15, 118, 128.  As such, a jury could not conclude Ms. White was deliberately indifferent. *See McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.") Accordingly, Ms. Hebison (White) is entitled to summary judgment.

### 6.    Ms. Henning

Reuther alleges Ms. Henning, a BHS supervisor, was deliberately indifferent to his serious medical needs by ignoring his inmate communications.  SAC at 7.

Reuther's allegation is insufficient to survive summary judgment.  While Reuther alleges Ms. Henning failed to respond to his inmate communications, he does not allege any specific dates.  The record shows Ms. Henning promptly responded to all inmate communications addressed to her.  *See* Reuther Decl. Claim I at 7–8, Exs. 103–04, 108, 129–30, 132.  As such, a jury could not conclude Ms. Henning was deliberately indifferent.  *See Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006) (holding prison administrators are liable for deliberate indifference "when they knowingly fail to respond to an inmate's requests for help.")  Accordingly, Ms. Henning is entitled to summary judgment.

### 7.    Ms. Jennings (Stoneman)

Reuther alleges Ms. Jennings (Stoneman) was deliberately indifferent to his serious medical needs by signing off on inmate communication forms and refusing to make urgent appointments.  SAC at 5–6.

Reuther's allegations are insufficient to survive summary judgment.  Although Reuther does not allege specific dates for these inmate communications, while in DSU he sent inmate communication forms to BHS on June 6, 2010, June 7, 2010, and June 8, 2010.  Reuther Decl. Claim I at 7, Exs. 99–101.  In these inmate communications Reuther complained about his Seroquel and Wellbutrin being dropped and asked to see a counselor "ASAP."  *Id.*  On all three dates, Ms. Stoneman responded "[y]ou are scheduled for a tentative [a]ppointment with CTS on 6/17 [w]hich is subject to change due to [s]taff availability."  *Id.*  The record is not clear as to

Page 31 - FINDINGS AND RECOMMENDATION

whether Reuther attended this scheduled appointment because on June 15, 2010, Ms. White met with Reuther to do a suicide assessment, in response to his inmate communication labeled "URGENT" and "EMERGENCY" and claiming he was suicidal. Ruthven Decl. ¶ 18, Att. 2 at 11, 13–14; Reuther Decl. Claim I at 7, Ex. 102–03. On June 21, 2010, Ms. Bruce also met with Reuther to do a suicide assessment and placed Reuther on suicide close observation. Ruthven Decl. ¶ 19, Att. 2 at 15–16. Thereafter Reuther was seen on a regular basis by Ms. White and Ms. Evans. Ruthven Decl. ¶¶ 20–22, Att. 2 at 17–20.

Reuther later met with Ms. Stoneman on March 8, 2011 and reported he was doing ok but complained of cellmate problems.[12] Ruthven Decl. ¶ 28, Att. 2 at 34. Reuther also told Ms. Stoneman she would not be named in this lawsuit. *Id.* Ms. Stoneman saw Reuther again on April 8, 2011, May 9, 2011, and June 15, 2011, and discussed his medical and mental health status. Ruthven Decl. ¶ 28, Att. 2 at 43–44; Reuther Decl. Claim I at 9, Ex. 148.

Given Ms. Stoneman's attention to Reuther's concerns, a jury could not conclude she was deliberately indifferent to his serious medical needs. *See McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.") Because there is no evidence Ms. Stoneman was deliberately indifferent to Reuther's medical needs, she is entitled to summary judgment.

---

[12] Ms. Stoneman noted on January 26, 2011 and February 2, 2011, Reuther refused call outs. Ruthven Decl. ¶ 28, Att. 2 at 33.

### 8.    Mr. Hurst

Reuther alleges Mr. Hurst was deliberately indifferent to his serious medical needs by ignoring his inmate communications. SAC at 9.

Reuther's allegation is insufficient to survive summary judgment. While Reuther alleges Mr. Hurst failed to respond to his inmate communications, Reuther does not allege any specific dates. The record indicates Reuther sent inmate communications to Mr. Hurst on November 22, 2011, November 26, 2011, December 1, 2011, December 2, 2011, December 3, 2011, December 5, 2011, December 6, 2011, and December 9, 2011. Reuther Decl. Claim I at 10–11, Exs. 159–68, 175. In these inmate communications, Reuther complained about depression and anxiety, and inquired as to referrals for mental housing unit ("MHU") placement, a prescriber appointment, one-on-one counseling, and group counseling. *Id.* Mr. Hurst responded to most, but not all of these inmate communications. *Id.* However, progress notes indicate Mr. Hurst met with Reuther on November 25, 2011 and December 7, 2011. Ruthven Decl. ¶ 29, Att. 2 at 56–57, Ruther Decl. Claim I at 10, Exs. 158, 171. At these meetings, Mr. Hurst stated that he would make a referral to the BHS manager to recommend Reuther to MHU, he had already scheduled a prescriber appointment with Dr. Corvino, and he had already completed referral forms for one-on-one and group counseling. *Id.*

Upon review of the inmate communications and responses, a jury could not conclude Mr. Hurst was deliberately indifferent. *See McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established."). The record shows Mr. Hurst either responded in

writing to Reuther's inmate communications or met with him in person to address his needs.

Accordingly, Mr. Hurst is entitled to summary judgment.

### 9.    Dr. Corvino

Reuther alleges Dr. Corvino was deliberately indifferent to his mental health needs when "[o]n or about October 27, 2011" he "dropped all psychotropic medication (4 different ones)" without examining him or his medical records.  SAC at 8–9.

Reuther's allegation is insufficient to survive summary judgment.  The record does not indicate any medication changes by Dr. Corvino on October 27, 2011.  Dr. Corvino's progress notes dated October 28, 2011, states correctional officers found multiple letters in Reuther's cell to another inmate describing the buying and selling of multiple medications including Effexor, Klonopin, Benadryl, and Xanax, and that two months prior Reuther had been caught cheeking medication.  Ruthven Decl. ¶ 31, Att. 2 at 53; Reuther Decl. Claim I at 9, Ex. 154.  Dr. Corvino noted Reuther was clearly not taking his medications as directed or to treat his mental health, he has a severe personality disorder which is only a weak indicator of a need for medication, and the medications prescribed for Reuther constitute a significant risk of harm to him and other inmates if they are misused.  *Id.*  Dr. Corvino's plan was to taper and discontinue all medications.  *Id.*  When Dr. Corvino saw Reuther again on December 9, 2011, Reuther reported no complaints of anxiety, depression, or suicidal ideation.  Ruthven Decl. ¶ 32, Att. 2 at 58; Reuther Decl. Claim I at 11, Ex. 176.

Contrary to Reuther's allegations, the record does not show Dr. Corvino dropped all of his psychotropic medications on October 28, 2011.  Rather, as a result of the letters found in Reuther's cell describing the buying and selling of medications, Dr. Corvino's plan was to taper

and discontinue all medications.  Ruthven Decl. ¶ 31, Att. 2 at 53; Reuther Decl. Claim I at 9,

Ex. 154. Although it is clear Reuther disagrees with Dr. Corvino's medical decision, he presents

no evidence that such decision was "medically unacceptable."  *See Toguchi*, 391 F.3d at 1058

(difference of opinion between a physician and prisoner concerning the appropriate course of

treatment is insufficient, as a matter of law, to establish deliberate indifference).  Accordingly,

Dr. Corvino is entitled to summary judgment.

### 10.   Mr. Nooth

Reuther alleges Mark Nooth, superintendent of SCRI, was deliberately indifferent to his

serious medical needs by failing to respond to inmate communications asking he be removed

from the care of BHS at SRCI.  SAC at 8.

While Reuther alleges Mr. Hurst failed to respond to his inmate communications, Reuther

does not allege any specific dates.  The record indicates Reuther sent inmate communications to

Mr. Nooth on March 14, 2011 and March 21, 2011.[13]  Reuther Decl. Claim I at 9, Exs. 141–42.

In these inmate communications, Reuther complained about the changes by BHS to his diagnosis

and medications.  *Id.*  In response to his March 14, 2011 inmate communication, an unknown

official responded for Mr. Nooth: "[t]his matter has been referred to BHS."  Reuther Decl. Claim

I at 9, Ex. 141.  In response to his March 21, 2011 inmate communication, an unknown official

responded for Mr. Nooth "[t]ransfer requests need to go to your counselor."  Reuther Decl. Claim

I at 9, Ex. 142.

---

[13] Reuther's March 14, 2011 inmate communication also states he sent an inmate
communication to Mr. Nooth on approximately February 14, 2011, however I'm unable to locate
this inmate communication in the record.

Page 35 - FINDINGS AND RECOMMENDATION

A prison administration may be "liable for deliberate indifference when [he or she] knowingly fail[s] to respond to an inmate's requests for help." *Jett*, 439 F.3d at 1098. However, Mr. Nooth is presumably not a medical professional and was not in a position to know what course of treatment was appropriate given Reuther's complex medical issues. Thus, Mr. Nooth's referral of the matter to BHS and Reuther's counselor was an appropriate response. *See Pabon v. Ryan*, 2007 WL 2404294, *10–11 (S.D. Cal. Aug 19, 2007) (dismissing a claim against a prison warden because, although the warden was aware of the plaintiff's medical condition, "[p]rison officials who are not trained medical professionals are entitled to rely on the treatment chosen by the prison doctors, unless the inadequacy of the treatment is obvious to a lay person"). Accordingly, Mr. Nooth is entitled to summary judgment.[14]

### 11.    Supervisor Liability

Finally, Reuther alleges defendants Jana A. Russell, BHS Administrator and Michael F. Gower, Administrator of ODOC, were deliberately indifferent to his medical needs by signing off on his First Appeal of Grievance and Second Appeal of Grievance, respectively, and not investigating. SAC at 7–8. Defendants contend Ms. Russell and Mr. Gower cannot be held liable solely on the basis of being supervisors. Defs.' Mem. Supp. Summ. J. at 4–6.

As a general rule, "liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Accordingly, "state officials are not subject to suit under § 1983 unless they play an affirmative part in the alleged deprivation of constitutional rights." *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir. 1987). "A

---

[14] Defendants contend Mr. Nooth cannot be held liable solely on the basis of being a supervisor. Defs.' Mem. Supp. Summ. J. at 4–6. Because I have determined Mr. Nooth was not deliberately indifferent, I do not reach this argument.

plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren*, 152 F.3d at 1194. There is no vicarious liability under § 1983. *Id.* "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Reuther does not provide copies of these grievances or responses, or provide any information regarding their contents. Reuther merely states he received a grievance response from Ms. Russell on October 25, 2010 and from Mr. Gower on December 8, 2010. Ruther Decl. Claim I at 8–9. Reuther's allegations against Ms. Russell and Mr. Gower appear to be made against them in their capacity as administrators and supervisors. While Reuther alleges Ms. Russell and Mr. Gower failed to investigate, Reuther has not presented any evidence Ms. Russell or Mr. Gower knew or should have known of any constitutional violations by subordinates. *See Taylor*, 880 F.2d at 1045. Further, because I have found no underlying constitutional violations as it relates to Reuther's mental health treatment, Reuther's claims against Mr. Russell or Mr. Gower as supervisors fail. *See Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009). Accordingly, Ms. Russell and Mr. Gower are entitled to summary judgment.

**B.    Back Pain Treatment**

Defendants argue they were not deliberately indifferent to Reuther's medical needs when treating his chronic back pain. Defs.' Mem. Supp. Mot. Summ. J. at 12–16. After a thorough review of the record, I find, for the reasons set forth below, no reasonable jury could conclude defendants were deliberately indifferent to Reuther's medical needs.

Reuther alleges in a general fashion that defendants were deliberately indifferent to his chronic back pain, previously diagnosed as multi-level degenerative disease. SAC at 12–17. Reuther alleges each defendant failed to follow through with once prescribed medication and treatment, but provides very few facts to support these allegations. *Id.* Reuther does however provide the dates on which he alleges each defendant acted with deliberate indifference. *Id.* at 14–17. As such, I will consider the actions taken by defendants on the dates listed by Reuther and the minimal facts he provides.

### 1.    February 15, 2012

Reuther alleges on February 15, 2012, Dr. Norton, Dr. DiGiulio, Dr. Shelton, Dr. VanHouten, and Nurse Gruenwald acted with deliberate indifference. SAC at 14–17. It appears Reuther alleges these defendants acted with deliberate indifference on this date based on the medications prescribed and denial of a second MRI. *Id.* at 16.

The record shows on February 15, 2012, Dr. Norton saw Reuther, who complained of pain through his right buttock into his proximal thigh. Shelton Decl. ¶ 18, Att. 2 at 30–31; Reuther Decl. Claim IV at 4, Exs. 73–74. Dr. Norton wrote Reuther a three-month trial prescription for Neurontin. *Id.* A TLOC recommendation written that same day indicates Dr. Norton diagnosed Reuther with degenerative disc disease of the lumbar spine and constipation. Reuther Decl. Claim IV at 4, Ex. 75. Dr. Norton also denied another MRI. *Id.* This TLOC recommendation indicates it was reviewed by the Committee on February 21, 2012, which included Dr. DiGiulio, Dr. Shelton, Dr. VanHouten, and Dr. Dewsnup. *Id.* The record does not indicate any actions taken by Nurse Gruenwald on either of these dates.

While Reuther may be upset he was denied a second MRI, he presents no evidence that such decision was "medically unacceptable." *See Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference).

### 2.    April 17, 2012

Reuther alleges on April 17, 2012, Dr. Norton, Dr. DiGiulio, Dr. VanHouten, Dr. Shelton, Dr. Gulick, Nurse Gruenwald, and Nurse Miller acted with deliberate indifference. SAC at 14–17.  It appears Reuther alleges these defendants acted with deliberate indifference on this date by discontinuing Ultram. *Id.* at 16.

The record shows on April 14, 2012, Reuther was placed on suicide close observation, which lasted until April 25, 2012.  Shelton Decl. ¶ 21, Att. 2 at 14–23; Reuther Decl. Claim IV at 6, Ex. 82.  On April 17, 2012, Dr. Norton discontinued his prescription for Ultram.  Shelton Decl. ¶ 21.  A TLOC recommendation written that same day indicates it was reviewed by the TLOC which included Dr. DiGiulio, Dr. Shelton, Dr. VanHouten, and Nurse Miller.  Reuther Decl. Claim IV at 6, Ex. 81.  The record does not indicate any actions taken by Dr. Gulick or Nurse Gruenwald around this time, however I note there are a large number of illegible progress note entries made while Reuther was on suicide close observation.  Shelton Decl. Att. 2 at 14–23; Reuther Decl. Claim IV at 6, Ex. 82.

The decision by these physicians to discontinue Ultram was made while Reuther was on suicide close observation and Reuther presents no evidence such decision was "medically unacceptable." *See Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and

prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference).

### 3.    June 25, 2012

Reuther alleges on June 25, 2012, Dr. Norton acted with deliberate indifference. SAC at 14–17. The only facts Reuther provides is that on this date, Dr. Norton prescribed him pain medication for chronic back pain. *Id.* at 15.

The record shows on May 16, 2012, Dr. Norton saw Reuther and prescribed Neurontin and Lodine for his back pain. Shelton Decl. ¶ 21, Att. 2 at 13–14; Reuther Decl. Claim IV at 6, Exs. 82–83. At a follow up appointment with Dr. Norton on June 25, 2012, Reuther complained of tingling in his fingers. Shelton Decl. ¶ 22, Att. 2 at 12; Reuther Decl. Claim IV at 6, Ex. 84. Dr. Norton noted Reuther walked with a normal gait and no grimacing. *Id.* Dr. Norton increased the dosages of Neurontin and Lodine. *Id.*

Because it does not appear any changes were made in Reuther's diagnosis or prescriptions on June 25, 2012, I am unable to determine why Reuther alleges Dr. Norton acted with deliberate indifference on this day. Reuther's SAC even acknowledges Dr. Norton prescribed him medication for his chronic back pay on this day. SAC at 15.

### 4.    June 28, 2012

Reuther alleges on June 28, 2012, Dr. Norton acted with deliberate indifference. SAC at 14–17. It appears Reuther alleges Dr. Norton acted with deliberate indifference on this date by discontinuing his Neurontin. *Id.* at 16.

The record shows on June 27, 2012, Reuther was caught cheeking his Neurontin and was sent to DSU. Shelton Decl. ¶ 23, Att. 2 at 11; Ruthven Decl. ¶ 35, Att. 4 at 1–4. As a result, on

Page 40 - FINDINGS AND RECOMMENDATION

June 28, 2012, Dr. Norton discontinued his Neurontin noting "apparently he no longer needs this medication." Shelton Decl. ¶ 23, Att. 2 at 11. At an appointment a few days prior, Reuther had told Dr. Norton "I'm never going to divert my medication again." Shelton Decl. ¶ 22, Att. 2 at 12; Reuther Decl. Claim IV, Ex. 84.

The decision by Dr. Norton to discontinue Neurontin was made after Reuther was found cheeking Neurontin. As the Declaration of Dr. Shelton notes, "[as a] physician, when we find this behavior we have to reconsider the individuals complaints of pain and need for that medication. It is reasonable to suspect that if the individual is not actually taking the pain medication, then perhaps it is not so necessary." Shelton Decl. ¶ 23. After it was reported Reuther was caught cheeking his Neurontin, Dr. Norton found "apparently he no longer needs this medication (see my note of 6/25/12) will discontinue Neurontin." Shelton Decl. ¶ 23, Att. 2 at 11. Although Reuther may disagree with this decision, Reuther presents no evidence such decision was "medically unacceptable." *See Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference).

### 5.    November 14, 2012

Reuther alleges on November 14, 2012, Dr. Norton acted with deliberate indifference. SAC at 14–17.[15] It appears Reuther alleges Dr. Norton acted with deliberate indifference on this date when he refused to renew a bottom bunk restriction, which Reuther states was in retaliation for diverting medication. *Id.* at 16.

---

[15] Reuther also alleges Dr. Norton acted with deliberate indifference on December 5, 2012. SAC at 14–17. However, Reuther provides no facts to support this and the record contains no evidence of a visit or any actions by Dr. Norton on December 5, 2012.

The record does not contain any physician records of Dr. Norton dated November 14, 2012. However, inmate communication forms, grievance forms, and grievance response forms indicate Reuther was seen by Dr. Norton on November 14, 2012, and was prescribed Naproxen for pain. Reuther Decl. Claim IV at 7, Exs. 85–90. It also appears Reuther previously had a bottom bunk restriction, which Dr. Norton did not renew. *Id.*

The record contains no evidence of an intent by Dr. Norton to retaliate. A grievance response dated November 28, 2012 by Nurse M. Magidow states "I have reviewed your recent medical records. You were seen by the provider on 11/14/2012 and your bottom bunk restriction was not renewed at that time. You may address your concerns at your next provider appointment." Reuther Decl. Claim IV at 7, Ex. 89. This grievance response was approved by defendant Ms. M. Fuzi. *Id.* On December 3, 2012, a unknown registered nurse sent an inmate communication response to Reuther stating "I presented your case to the provider who in turn denied your request for a lower bunk. He would like to see how you do with a greater activity level." Reuther Decl. Claim IV at 7, Ex. 90. Although Reuther may not like that Dr. Norton did not renew his bottom bunk restriction, Reuther presents no evidence such decision was "medically unacceptable." *See Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference).

### 6.    January 7, 2013

Reuther alleges on January 7, 2013, Dr. DiGiulio, Dr. Beamer, Dr. Shelton, Dr. Dewsnup, Dr. Kelly, Dr. Norton, Dr. VanHouten, and Mr. Nutt acted with deliberate indifference.[16] SAC at 14–17.  It appears Reuther alleges defendants were deliberately indifferent by not prescribing Ultram "[c]laiming not medically necessary, despite MRI, X-rays that support the need for more treatment than Mr. Reuther is getting at this time." *Id.* at 16.

The record contains progress notes dated January 7, 2013, with entries by an unknown provider(s).  Reuther Decl. Claim IV at 8, Exs. 100–01.  The record also contains a request by Dr. DiGiulio dated January 7, 2013, to the Medication Review Committee for Ultram, which states "Not Approve.  Not Medically Inclinate."  Reuther Decl. Claim IV at 8, Ex. 102.

Presumably, Reuther was seen by Dr. DiGiulio and the Medication Review Committee comprised of Dr. Beamer, Dr. Shelton, Dr. Dewsnup, Dr. Kelly, Dr. Norton, Dr. VanHouten, and Mr. Nutt.  Although Reuther may not like that he was not prescribed Ultram, Reuther presents no evidence such decision was "medically unacceptable."  *See Toguchi*, 391 F.3d at 1058 (difference of opinion between a physician and prisoner concerning the appropriate course of treatment is insufficient, as a matter of law, to establish deliberate indifference).

---

[16] Reuther also alleges Dr. Shelton was deliberately indifferent on January 10, 2013 and Dr. DiGiulio was deliberately indifferent on February 15, 2013.  SAC at 14.  However, Reuther provides no facts to support these allegations and the record contains no evidence of a visit or any actions by Dr. Shelton on January 10, 2013 or Dr. DiGiulio on February 15, 2013.

### 7.    March 7, 2013

Reuther alleges on March 7, 2013, Mr. Gower acted with deliberate indifference.  SAC at 14–15.  Reuther however provides no facts to support why Mr. Gower acted with deliberate indifference on this date.

The record contains two letters dated March 7, 2013, from Mr. Gower to Reuther in response to grievance appeals he sent regarding his medical treatment.  Reuther Decl. Claim IV at 8, Exs. 103–06.  The first letter concerned the denial of Ultram by the TLOC on January 7, 2013 and the second letter concerned his denial of a request for a low bunk.  *Id.*  In both cases Mr. Gower stated he reviewed Reuther's concerns and concluded that "[m]edical staff has acted reasonably and responsibly with appropriate conservative care measure and will continue to provide appropriate follow up care as needed."  *Id.*

For the same reasons as above, it appears Reuther is attempting to hold Mr. Gower liable simply as a supervisor.  Given I find that there are no constitutional violations concerning the denial of Ultram by the TLOC or the denial of a request for a low bunk by Dr. Norton, Reuther's claim against Mr. Gower as a supervisor must fail.  *See Corales*, 567 F.3d at 570.

### 8.    May 1, 2013

Reuther alleges on May 1, 2013, Ms. Fuzi acted with deliberate indifference.  SAC at 14–15.  Reuther however provides no facts to support why Ms. Fuzi acted with deliberate indifference on this date.

A letter from Ms. Fuzi to Reuther indicates they met on April 24, 2013, to discuss multiple inmate communications he had sent that month.  Reuther Decl. Claim IV at 9, Ex. 113.  On April 30, 2013, Ms. Fuzi responded to a five-page inmate communication Reuther had sent

on April 28, 2013 complaining about the medical care he was receiving.[17]  Reuther Decl. Claim

IV at 9, Exs. 114–18.  Ms. Fuzi responded "[a]s I explained during our conversation, you will be

scheduled with Dr. DiGiulio to discuss your concerns.  These will not be addressed at sick call or

kytes unless symptoms change.  Your medical care will continue as needed and addressed

through the appropriate process."  Reuther Decl. Claim IV at 9, Ex. 118.

It is unclear why Reuther alleges Ms. Fuzi was deliberately indifferent given there is no

record of any action taken by her on May 1, 2013, and she responded to all of his inmate

communications he sent during April 2013.  A prison administration may be "liable for deliberate

indifference when [he or she] knowingly fail[s] to respond to an inmate's requests for help."

*Jett*, 439 F.3d at 1098.  Here, however, there is no evidence in the record of deliberate

indifference by Ms. Fuzi on or around May 1, 2013.

### 9.    Conclusion

Having considered the actions taken by defendants on the dates listed by Reuther, along

with the record, I find a jury could not conclude defendants were deliberately indifferent.

Significantly, Reuther has failed to include any allegations concerning the state of mind of

defendants.  *See Clement*, 298 F.3d at 904–05 (providing that a prison official must be

subjectively aware of the seriousness of the condition and deliberately deny or delay access to

medical care that could reasonably have been provided).  Nor does the record support an

---

[17] Much of Reuther's five-page inmate communication relates to his treatment for irritable
bowel syndrome and other intestinal problems.  Reuther Decl. Claim IV, Exs. 114–18.  On
November 19, 2013, Reuther moved for leave to file a fifth amended complaint (#157) adding a
claim related to defendants' treatment of his intestinal problems.  The court denied Reuther's
motion noting he had already filed a new complaint raising this claim (#182).  As such, I will not
consider any of Reuther's allegations regarding defendants' treatment of his intestinal problems.

inference that defendants acted in conscious disregard to Reuther's back pain. Accordingly, defendants are entitled to summary judgment.

**C.    Summary**

Viewing the evidence in the light most favorable to plaintiff — as I am required to do at the summary judgment stage — I find that Reuther has failed to generate a genuine issue of material fact as to whether defendants were deliberately indifferent to his medical needs under the Eighth Amendment. Reuther's medical records show that he consistently saw medical staff, who responded to his inmate communications, and he was frequently prescribed medication for both his mental health issues and chronic back pain. "The volume and content of the medical records and the frequency of [plaintiff's] medical visits contradict [plaintiff's] subjective opinion that [defendants] purposefully ignored or failed to respond reasonably to [plaintiff's] pain or medical needs." *Daniel v. Levin*, 172 F. App'x 147, 149 (9th Cir. 2006). I have also considered the mitigating circumstances Reuther requested (#175) and find them not relevant as to whether defendants were deliberately indifferent to his medical needs.

While Reuther may have wished for different medical care or a more aggressive course of treatment, his allegations fall short of establishing an Eighth Amendment violation. *See Estelle*, 429 U.S. at 107 (noting that the plaintiff "was seen by medical personnel on 17 occasions spanning a 3-month period" and concluding that, even though plaintiff claimed medical staff inadequately treated his back injury, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment"); *see also Young v. Nooth*, 2011 WL 4501936, *10–11 (D. Or. July 18, 2011) (discussing *Estelle* and concluding that the plaintiff's "belief that the care he received was inadequate is insufficient to support his Eighth Amendment

claim"). Accordingly, for the reasons set forth above with regard to each defendant and viewing Reuther's medical care as a whole, I find defendants are entitled to summary judgment on Claim I and Claim IV.

## III.    Seizure of Legal Materials and Prescription Glasses

Inmates have no Fourth Amendment right of privacy in their prison cells. *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984); *Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996). "Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Hudson*, 468 U.S. at 528 n.8. Further, the "unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Id.* at 533; *see also Barnett v. Centoni*, 31 F.3d 813, 816–17 (9th Cir. 1994).

### A.    Legal Materials

Defendants argue Officer Carter did not violate Reuther's Fourth and Fourteenth Amendment rights by searching his cell and seizing his legal materials. Defs.' Mem. Supp. Mot. Summ. J. at 16–18. I agree.

It is clearly established Reuther has no Fourth Amendment right to privacy in his prison cell. *Hudson*, 468 U.S. at 525–26. In regards to Reuther's Fourteenth Amendment rights under the Due Process Clause, Reuther has not alleged he pursued any post-deprivation remedy for the loss. In fact, Reuther has not produced any evidence he sent an inmate communication to prison officials, filed a grievance, or pursued any other postdeprivation remedy for the loss. *See* Pl.'s Resp. Defs.' Mot. Summ. J. at 13. Further, Reuther does not dispute that the legal materials

Page 47 - FINDINGS AND RECOMMENDATION

seized contained plans and materials on how to forge checks and commit credit card fraud. *See id.* Reuther has state remedies under Oregon law available him including small claims court or an action for conversion. *See Giba v. Cook*, 232 F. Supp. 2d 1171, 1184 (D. Or. 2002) (granting summary judgment in favor of prison officials on Fourteenth Amendment claim for seizure of legal materials). Officer Carter therefore did not violate Reuther's Fourteenth Amendment rights. Accordingly, Officer Carter is entitled to summary judgment on Claim II.

### B. Prescription Glasses

Defendants do not concede they seized Reuther's prescription glasses, but argue even if they had, Officer Wilcox and Officer Lopez did not violate Reuther's Fourth Amendment rights. Defs.' Mem. Supp. Mot. Summ. J. at 18–20. I agree.

As already noted, Reuther has no right to privacy under the Fourth Amendment. *Hudson*, 468 U.S. at 525–26. Although Claim III of Reuther's SAC asserts a Fourth Amendment violation, construing Reuther's *pro se* complaint liberally, along with his Response to defendants' motion, it appears he also asserts this claim under the Due Process Clause of the Fourteenth Amendment.[18] However, even if I construe Reuther's claim as alleging a violation of the Due Process Clause of the Fourteenth Amendment, Reuther has not alleged he pursued any postdeprivation remedy for the loss after filing a tort claim notice. Reuther has state remedies under Oregon law available to him including small claims court or an action for conversion. *See Giba*, 232 F. Supp. 2d at 1184. As a result, Officer Wilcox and Officer Lopez did not violate

---

[18] "Plaintiff's response to defendants' stating that Plaintiff's claiming Fourth Amendment violation, I've corrected this mistake in the 4th amended complaint. (Doc. # 140) To Fourth and Fourteenth Amendments, and the date of May 17, 2010." Pl.'s Resp. Defs. Mot. Summ. J. at 13.

Reuther's Fourteenth Amendment rights either.  Accordingly, Officer Wilcox and Officer Lopez are entitled to summary judgment on Claim III.[19]

## IV.    Qualified Immunity

Defendants argue they are alternatively entitled to qualified immunity.  Defs.' Mem. Supp. Summ. J. at 20–21.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 828 (1982).  The qualified immunity inquiry has traditionally involved two prongs.  First, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the first step is satisfied, the court must then decide whether the right at issue was "clearly established" at the time of the alleged violation.  *Id.*  However, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Having found no violation of a constitutional right, I do not reach the issue of qualified immunity.

---

[19] Defendants alternatively argue Reuther's claim should be dismissed without prejudice for failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA"). Defs.' Mem. Supp. Mot. Summ. J. at 18–20. Because I have determined Officer Wilcox and Officer Lopez are entitled to summary judgment in their favor, I decline to address this argument.

## V.    Dr. Fickle and Dr. Bowman

Finally, I note defendants Dr. Fickle and Dr. Bowman have not appeared in this action and are not part of the present motion for summary judgment.

On May 2, 2012, Reuther filed an amended complaint (#23).  On September 10, 2012, Senior Assistant Attorney General Michael R. Washington executed a waiver of service, but declined to waive service on behalf of Dr. Fickle and Dr. Bowman (#42).  On September 26, 2013, the court directed the U.S. Marshals to serve Dr. Fickle and Dr. Bowman (#43) and service was returned unexecuted (#71 & #72).  Thereafter, Reuther filed a "Motion to Compel Defendants to Produce Addresses of Dr. Fickle and Dr. Bowman" (#85 & #86).

On May 28, 2013, this court granted Reuther leave to file a second amended complaint (#124) and denied all other motions as moot, including Reuther's Motion to Compel.  On May 31, 2013, Reuther filed this SAC (#128), which all defendants answered (#142) except for Dr. Fickle and Dr. Bowman.  The record does not show Reuther ever attempted service of the SAC on Dr. Fickle and Dr. Bowman.  However, I note Reuther filed an objection (#129) to the court's denial of all other motions as moot, including his Motion to Compel.

However, based on my findings above, even if Dr. Fickle and Dr. Bowman had been served with process and made defendants in this case, they would be entitled to summary judgment for the reasons set forth herein.  *See Kyger v. Oregon*, 2010 WL 5487540, * 8 (D. Or. Dec. 10, 2010) *adopted by* 2010 WL 5487538 (D. Or. Dec. 30, 2010).

## RECOMMENDATION

For the reasons set forth above, defendants' motion for summary judgment (#159) should be granted and this case should be dismissed with prejudice.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 10th Day of June, 2014.

Paul Papak
United States Magistrate Judge